*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re G. G. Wendt, Minor.

UNPUBLISHED
April 28, 2022

No. 358522
St. Clair Circuit Court
Family Division
LC No. 20-000198-NA

Before: LETICA, P.J., and REDFORD and RICK, JJ.

PER CURIAM.

Respondent-father[1] appeals as of right the trial court's order terminating his parental rights to GG under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist); (g) (the parent failed to provide proper care or custody for the child); and (j) (reasonable likelihood the child would be harmed if returned home). We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

GG lived with respondent, respondent's live-in girlfriend, and her teenage son. On October 8, 2020, respondent was admitted to an inpatient psychiatric facility after he threatened to kill his Community Mental Health therapist, Jennifer Fye. Four days later, the Michigan Department of Health and Human Services (DHHS) filed a petition to remove GG from respondent's care, alleging respondent's mental health concerns necessitated removing him from the home.

The removal petition alleged that respondent inflicted physical and emotional abuse upon GG that caused the child to sustain a broken collarbone and dislocated shoulder, and a large contusion on his forehead that doctors found inconsistent with respondent's explanation of how the injury occurred. The mental and emotional abuse suffered by the child included being told by respondent and his girlfriend that he was "awful, mean, and horrible," and "as evil as ever." GG's teacher reported that respondent and his girlfriend treated GG like "a villain," and she witnessed respondent's girlfriend screaming at GG and calling him a liar. Respondent and his girlfriend also

---

[1] GG's mother is not a party to this appeal.

told GG there was "a police factory behind their home that burned bad children." The petition alleged further that respondent failed to address his own mental health issues, anger, and marijuana abuse and failed to comply with a treatment plan.

At the preliminary hearing, respondent waived a probable cause hearing. The trial court authorized the petition and ordered GG removed from the home and placed him with his paternal grandmother. Respondent did not approve of GG's placement and preferred that GG be placed in a foster home. Respondent pleaded no contest to the petition's allegations and stipulated to using the petition to establish a factual basis for accepting his plea. The court ordered respondent to comply with medication and mental health treatment and suspended his parenting time until respondent could adequately meet his mental health needs so that he no longer posed a threat to GG's well-being as determined by a mental health professional.

Jennifer Fehn, an outpatient therapist at New Oakland Family Centers, began working with respondent on November 3, 2020, when respondent scheduled an intake evaluation after his inpatient psychiatric treatment. Respondent told Fehn that he had been hospitalized because he experienced negative side effects to his medications. Fehn, however, found out later that he had been hospitalized in relation to his threatening Fye, his therapist. Respondent was diagnosed with major depressive disorder, generalized anxiety disorder, and cannabis use disorder. Respondent also disclosed that his mother's boyfriend abused him when he was a child. Fehn reported that, although respondent went to nearly all scheduled meetings, he did not make progress addressing his treatment objectives.

Respondent admitted that he used marijuana daily to cope with his anger, even though his psychiatrist told him not to use marijuana with his antidepressant medication. Respondent completed a substance abuse evaluation which indicated that he would benefit from substance abuse education. Respondent continued to test positive for THC at every scheduled drug screening.

Responded attended therapeutic visits with GG and complied with many of the requirements. He completed a virtual parenting class and a relationship violence program to address his history of domestic violence. He also attended Foster Care Supportive Visitation and behaved appropriately when supervised.

In April 2021, GG disclosed that the teenaged son of respondent's girlfriend sexually abused him. GG told multiple people of the abuse including Suzette Tweedie-Stapleton, a therapist who provided GG individual counseling and conducted therapeutic parenting sessions with GG's parents. Tweedie-Stapleton testified that GG told her that the teenager touched GG inappropriately. GG also disclosed the inappropriate touching to his grandmother.

The Children's Advocacy Center interviewed GG but he did not make a full disclosure; he would "get up to the point about talking about it and then completely shut down." A Port Huron Police Department detective also interviewed GG at his grandmother's home. Because GG typically did not open up to strangers, the detective spent time with him to develop trust. During the interview, GG "shut down" and said that he did not want to go to jail. GG, however, later disclosed the incident to Sarah Mielke, his DHHS foster care worker. Respondent told Mielke

during a family meeting that he believed that a different child who looked like his girlfriend's son assaulted GG.

At the next review hearing, Mielke told the court about the ongoing criminal investigation of GG's sexual abuse and reported that on April 29, 2021, respondent became hostile with Mielke during a home visit, began "balling up his fists" and started yelling at Mielke. Mielke walked out of the home for her own safety, but respondent followed her and continued yelling at her. At another review hearing, Mielke reported that the criminal investigation of GG's sexual abuse remained pending. She also reported that respondent became hostile with her during another home visit. Respondent and his girlfriend attended a family meeting where respondent became "hostile and elevated." Mielke had to excuse herself because respondent became very upset and began "clenching his fist" and screaming at her. Mielke reported that respondent and his girlfriend made excuses and stated that they did not believe GG's allegations. Mielke reported "there is a concern that [respondent] is unwilling to do what's necessary to keep [GG] safe." In June 2021, the court suspended respondent's parenting time.

DHHS petitioned to terminate respondent's parental rights under MCL 712A.19b(3)(c)(i), (g), and (j) on the grounds that respondent's home was "unfit due to [respondent]'s continuing to be noncompliant with the Parent Agency Treatment Plan and is failing to benefit from services." The petition alleged that respondent showed up unannounced to Fehn's office and became agitated when told of Fehn's unavailability. When Fehn later called respondent, he became angry and yelled at her. Respondent's girlfriend took the phone from him but he continued to "yell and scream" in the background. Because of respondent's behavior, Fehn felt threatened and reported the incident to the Port Huron Police Department. She later sought and obtained a personal protection order (PPO) against respondent.

Fehn testified at the termination bench trial that respondent had not benefited from counseling. He failed to "meet his standard objectives for treatment," "he used many defense mechanisms in sessions like rationalization, denial, blame, projections" and "he didn't want to fully discuss the issues at hand." Tweedie-Stapleton, the therapist working with GG during therapeutic parenting sessions, testified that respondent attended all scheduled appointments and acted appropriately. However, GG "never seemed to feel comfortable" with respondent, acted hesitantly when respondent requested hugs, and did not ask about respondent after his sessions ended. Tweedie-Stapleton also testified that GG seemed "extremely happy" when with his mother, but he usually had a "flat affect" with respondent.

Respondent testified: "I love my son, I was always there. He was always with us. He came with us everywhere we went." Respondent did not believe that his girlfriend's son sexually assaulted GG. Respondent testified that the PPO against him was unjustified because he did not threaten Fehn, he only yelled and swore at her. Respondent stated that his admission to the mental hospital occurred because he had a bad side effect from his medication and his grandmother had recently passed away. Respondent took no responsibility for GG's removal, stating that he did not know what he did wrong to have GG removed. He asserted that it was all due to "hearsay."

The trial court found that clear and convincing evidence established grounds to terminate parental rights under MCL 712A.19b(3)(c)(i) because the problems that led to adjudication—physical harm, emotional abuse, and respondent's failure to address his mental health diagnoses—

-3-

still existed, and respondent had not made appropriate steps to address these conditions. As to MCL 712A.19b(3)(g) and (j), the trial court found that clear and convincing evidence established that respondent failed to benefit from the service plan and he would not be able to provide the proper care for GG. The court found that respondent's "behavior is [the] exact same type of behavior that existed before the court ever got involved." The trial court also found that evidence established that termination of respondent's parental rights served GG's best interests. Respondent now appeals.

## II. ANALYSIS

## A. STATUTORY GROUNDS

We review for clear error a trial court's finding that a statutory ground under MCL 712A.19b(3) has been proven by clear and convincing evidence. *In re BZ*, 264 Mich App 286, 296; 690 NW2d 505 (2004). A finding is clearly erroneous if we are left with the definite and firm conviction that a mistake has been made. *Id.*; see also *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009). We give regard to "the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011).

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (citation omitted). "Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds." *In re Ellis*, 294 Mich App at 32. Respondent's parental rights in this case were terminated under MCL 712A.19b(3)(c)(i), (g), and (j). We consider each of these grounds and analyze them in turn.

Under MCL 712A.19b(3)(c)(*i*), the court may terminate parental rights if the court finds by clear and convincing evidence:

> The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial disposition order, and the court, by clear and convincing evidence, finds. . . . [t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

In this case, GG came into care because of physical and emotional abuse against GG by respondent. At the time of removal, respondent also struggled with his own mental health problems which affected his ability to properly care for GG. 182 days elapsed since the trial court entered the initial disposition order on December 11, 2020, and the termination of respondent's parental rights occurred after a two-day hearing on August 13, 2021.

Evidence established respondent's ongoing anger and volatility. He mistreated two different therapists. Respondent threatened to kill Fye, blaming her that GG did not sleep the night before, and blaming Fye for failing to fix GG. Only a few months later respondent exhibited threatening and violent behavior against his new therapist, Fehn, who obtained a PPO against respondent. Respondent displayed similar threatening and violent behavior toward Mielke during

-4-

two separate home visits which caused her to conclude that it was no longer safe for her to be in respondent's home.

Testimonies of witnesses established respondent's unwillingness and inability to change the conditions that led to GG's removal. Respondent refused to accept his anger problems in therapy with Fehn. He continued to use marijuana daily, contrary to guidance from his doctors and therapists. Fehn reported that respondent regularly attended therapy sessions with her but failed to progress in meeting his objectives of reducing his anxiety and depression. Fehn expressed concern about GG's well-being because of respondent's continued anger issues. Overall, respondent failed to address his problematic behavior that led to GG's removal. Clear and convincing evidence established statutory grounds under 712A.19b(3)(c)(*i*) to terminate respondent's parental rights. The trial court, therefore, did not err in this regard.

Petitioner presented clear and convincing evidence that established multiple grounds for termination. *In re Ellis*, 294 Mich App at 32. Under MCL 712A.19b(3)(g), proper grounds exist to terminate a respondent's parental rights when, "[t]he parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." In this case, clear and convincing evidence established respondent's failure to provide proper care for GG. Respondent continued to act abusively and emotionally unstable toward GG and others around him, including, being physically rough and emotionally abusive to GG in front of therapists and caseworkers.

Respondent argues that the trial court erred by terminating his parental rights because he did everything DHHS asked by attending counseling and participating in visitation appropriately. Mere participation in his service plan, however, does not suffice. "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re Smith*, 324 Mich App 28, 49; 919 NW2d 427 (2018) (quotation marks and citation omitted). See also *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014) ("[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home.") In this case, clear and convincing evidence established that respondent failed to benefit from services offered to him despite his attendance. Evidence established that respondent continued interacting inappropriately with angry, violent outbursts. After threatening to kill Fye on one occasion, he also threatened Fehn so severely that she obtained a PPO against respondent. Fehn testified that respondent failed to benefit from counseling. Respondent continued to deny responsibility and blamed others for GG's removal. Mielke also testified that respondent did not show any benefit from participating in the parenting and domestic violence classes he took.

Statutory grounds to terminate parental rights exist under MCL 712A.19b(3)(j) where, "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." The record indicates that GG experienced physical and emotional injury at the hands of respondent and his girlfriend. Caseworkers and therapists personally observed such behavior. Mielke testified that respondent refuses to put his son's needs before his own; Tweedie-Stapleton testified that she would be very concerned about GG's mental well-being if he continued to witness respondent's angry outbursts;

and Fehn testified, in her professional opinion, that GG would not benefit from being in the presence of respondent based on her experiences with respondent.

GG's sexual assault allegations against the son of respondent's girlfriend were also of grave concern because respondent disputed the allegations and expressed opposition to willingly take appropriate steps to protect GG under the circumstances. When Mielke explained to respondent that living with his girlfriend's son in the same household as GG presented safety concerns, respondent became combative and aggressive. Respondent refused to take steps to ensure GG's safety because he had no interest in leaving his girlfriend. The record indicates that respondent put his own needs before the needs of GG. Consistent with respondent's unwillingness to accept responsibility, respondent and his girlfriend refused to believe GG or take the allegations seriously. Respondent merely made excuses and blamed others, rather than taking steps to protect GG.

Respondent also failed to appropriately address GG's mental health concerns. Respondent desired to medicate GG or send him to a residential mental health facility. Further, evidence established that respondent acted to secure a mental health diagnosis for GG so that respondent could receive government disability benefits on GG's behalf. The record indicates that, following GG's removal, GG no longer displayed the conduct on which respondent relied for a mental health diagnosis for disability benefits.

Although only one statutory ground need be established to terminate parental rights, petitioner in this case established by clear and convincing evidence three statutory grounds requiring termination of respondent's parental rights. *In re Ellis*, 294 Mich App at 32. The trial court, therefore, did not err in finding that clear and convincing evidence established grounds for termination under MCL 712A.19b(3)(c)(*i*), (g), and (j).

## B. BEST INTEREST

Respondent argues that the trial court erred by concluding that termination of his parental rights served GG's best interests. We disagree.

"The clear error standard controls our review of both the court's decision that a ground for termination has been proven by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interest." *In re Williams*, 286 Mich App at 271 (quotation marks and citation omitted); MCR 3.977(K). "A trial court's decision is clearly erroneous 'if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.' " *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012) (brackets omitted), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). " 'The focus at the best-interest stage has always been on the child, not the parent.' " *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (brackets omitted), quoting *In re Moss*, 301 Mich App at 87. The best-interest determination must be supported by a preponderance of the evidence. *Id*. at 83. The trial court may consider the entire record, including evidence introduced

by all parties. *In re Medina*, 317 Mich App 219, 237; 894 NW2d 653 (2016). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted).

"[B]ecause 'a child's placement with relatives weighs against termination under MCL 712A.19a(6)(a),' the fact that a child is living with relatives when the case proceeds to termination is a factor to be considered in determining whether termination is in the child's best interests." *In re Olive/Metts*, 297 Mich App at 43, quoting *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). Thus, a trial court must address whether termination is appropriate "in light of the children's placement with relatives," and failure to do so requires reversal. *In re Olive/Metts*, 297 Mich App at 43.

In this case, after removal GG was placed with his paternal grandmother. The trial court recognized GG's placement in his relative's care and acknowledged respondent's unhappiness about the placement. Respondent asserts that GG had only been in family placement for a short period by the time of the termination hearing. Respondent does not elaborate or explain why this is pertinent. The record reflects that GG had been in his grandmother's care for approximately 10 months at the time of the termination hearing. Over those 10 months, GG's mood and behavior improved, especially after visits with respondent were suspended. Mielke testified that GG did "extremely well" in the placement and appeared bonded with his grandparents.

The evidence, however, does not indicate that GG had a bond with respondent. *In re White*, 303 Mich App at 714. Although respondent testified that he loved his son and did not want his parental rights terminated, Mielke testified that GG and respondent lacked a bond. Witnesses testified that GG only reluctantly hugged respondent during visits after respondent requested a hug multiple times. Further, in respondent's presence, GG displayed a flat affect, showed little emotion toward respondent, and did not want to talk about respondent at any time after parenting sessions. Tweedie-Stapleton testified GG "never seemed to feel comfortable" during the visits with respondent. GG also never asked about respondent between visits. By contrast, GG's visits with his mother were significantly different: GG seemed happy, engaged, and he often giggled while with her. The record also indicates that respondent lacked parenting ability and did not place the child's interests before his own.

The record supports the trial court's decision that termination of respondent's parental rights served GG's best interests. We are not left with a "definite and firm conviction that a mistake has been made" in this case. *In re Williams*, 286 Mich App at 271. The trial court did not err when it determined that a preponderance of evidence established that termination served GG's best interests.

Affirmed.

/s/ Anica Letica
/s/ James Robert Redford
/s/ Michelle M. Rick